## JOHNSTON v STATE

Ohio Appeals, 8th Dist, Cuyahoga Co

No 14123.  Decided March 7, 1935

Day & Day, Cleveland, and Ray T. Miller, Cleveland, for plaintiff in error.

Frank T. Cullitan, Prosecuting Attorney, Cleveland, and Henry S. Brainard, Assistant Prosecuting Attorney, Cleveland, for defendant in error.

ROSS, PJ, MATTHEWS and HAMILTON, JJ, (1st Dist) sitting by designation.

## OPINION

By ROSS, PJ.

The one fact that is more clear to the Court than any other, and it is a pivotal consideration, is that Johnston never knew of this prohibition of the Bank Examiners. On the other hand, Smith was told directly by the Examiner of his refusal to permit the Building Bonds as an asset · of the Bank. The State is compelled to admit the absence of direct proof of such knowledge on· the part of Johnston, but insists that the subsequent developments show that he must have become aware of the fact. At the most, these sundry manipulations, all the creatures of Smith's ingenuity, could create but a probability of such knowledge. This is giving this evidence its maximum effect, and a greater weight than we think warranted. While, of course, it is not necessary for the State to prove each fact

beyond a reasonable doubt, it is necessary for the state to prove as an element of the crimes charged; in this case **criminal** intent, a wilful, purposeful intention to violate the law invoked. The evidence falls far short of such effect.

Pursuant to the agreement between The First National Company of Baltimore and The Standard Trust Bank, the securities constituting obligations of The First National Company were delivered to that organization by The Standard Trust Bank. Ultimately, the Building Bonds **actually** did find their way into the assets of the Bank after many months and by a most circuitous route. As will be noted later, they were probably actually delivered to the Bank coincident with or approximately coincident with the delivery of the First National Securities. It is claimed that these Building Bonds were only received as such assets when the Bank purchased them again for cash. The most that the evidence in this connection shows—is that the entries of the Bank and its affiliate Securities Corporation, the Standard Corporation, show they were so purchased. We are not at all convinced that the Bank actually paid for them again. We incline to the belief that they were promptly delivered to the Bank through the Corporation.

It became necessary for Smith, upon whom rested the direct obligation to secure the opening of the new Bank, to make arrangements to substitute cash for the objectionable bonds. This was not in Johnston's department, and in fact it is apparent to us that he probably would have refused to become a party to the subsequent transactions, had he known about their real nature. In any event, Smith found it unnecessary to divulge the real nature of the transactions, and simply informed Johnston that it would be necessary for the bank to have ready cash in order to open. As far as Johnston was concerned, the bonds constituted logical collateral for this purpose, and he saw good reason why the Brotherhood should pledge also its security by giving its note for this purpose. He, therefore, with Smith arranged for a loan from The Equitable Trust Company of New York for $450,000. The amount of the loan seems significant.

From this point on, two parallel lines of thought run through the varied ensuing transactions, each governed by the conception peculiar to the initial participation of the parties in the loan from The Equitable Trust Company to the Brotherhood. Smith

knew that the loan was made for the purpose of effecting the substitution of cash for the rejected bonds. Johnston thought it was an accommodation loan to the Brotherhood for the benefit of the Bank. Smith constantly resorted to expedient upon expedient to cover up the fact that real cash had not been put in as a Bank asset. Johnston was wholly unconcerned as to the book entries, for which he was most remotely responsible, convinced that in fact the Bank could and would take care of an obligation which was essentially its own debt.

It would serve no purpose to in detail mention the transactions incident to the several loans which succeeded each other, and by which Smith moved from one point to another in covering up the original deception practiced both upon the Examiner and Johnston. This is true, although the several counts in the indictment, noted previously, refer to the several steps in such manipulations. The reason is that Johnston's connection with them is, as will be noted hereafter, only that of remote association, only connected mechanically by reason of his official relation to the organization involved. An analysis of the evidence applicable to each count would unduly extend the opinion. These several steps involve the loan from The Chase National Bank of New York, the loan from The Empire Trust Company, and the note of the Brotherhood to The Standard Corporation.

One incident requires comment. The bonds actually were in a depository. When The First National Company of Baltimore accepted its own obligations in exchange for the Building Bonds, it issued an order for delivery of the bonds to The Standard Trust Bank. Johnston, as the head of the Brotherhood, was thereupon called upon to cause delivery of the Bonds to be made to the Bank. He secured the Bonds from the Cleveland depository, and sent them by messenger to the Bank. The securities affiliate of the Bank in The Standard Corporation was, as has been pointed out, as identical with the Bank as two separate corporate entities could be. It had its offices in the same suite with the Bank. Many of the employes of each performed duties for the other. A Miss Lois E. Law, who was a clerk in both the Bank and the Corporation received the Bonds from Johnston's messenger. She, apparently believing that the bonds were peculiar to the Corporation rather than the Bank, gave the messenger a Standard Corporation receipt, which if Johnston even saw it would not be sufficient to cause any comment or objection. Were it not for the sinister significance now attributed to it by the State, little attention would be given under ordinary circumstances to the substitution of the name of the receipting corporation. We question even under the circumstances whether the receipt can be tendered as evidence supporting the claim that the Bank did not in fact receive the Bonds. Certainly as far as Johnston was concerned it did.

We have stated before, that the State claims that the bonds were subsequently actually purchased by the Bank at a fixed price. The entries in the books of the Bank and the Standard Corporation support this contention. Such entries, however, are still consistent with the parallel lines of conception before suggested existing in the minds of Smith and Johnston. Such entries constituted the final incident in the subterfuge planned and executed by Smith to evade the order of the Examiner. There is not a scintilla of evidence that the Brotherhood actually was paid for the Bonds again, or that Johnston had any knowledge whatever of these entries. We have in mind the entry upon the books of The Standard Corporation showing a credit upon the Brotherhood note of some $61,-000.00 differential, when we make this statement.

It is strenuously asserted by the State that the First National securities delivered by the Bank to the First National Company of Baltimore were under the Brotherhood agreement of October 31, 1929, to be paid for in cash by the Brotherhood, and that there was, therefore, exclusive of the order of the Examiner no authority in Johnston to substitute Building Bonds as a Bank asset. If this were a civil action, in which the rights of the Bank and Brotherhood were being determined, we might see the force of this contention. On the other hand, we fail to see its significance in reflecting, as far as Johnston is concerned, a criminal intent.

One other feature of the case requires comment. The Brotherhood met in Convention in the early part of June, 1930. A number of incidents occurred in which Johnston took part, the result of which was to conceal from the membership of the Brotherhood that the Organization was obligated to the extent of the original Equitable Trust loan. It is quite apparent that while Johnston considered himself thor-

oughly justified in pledging the Brotherhood to aid the Bank, that he might not wish to explain the entire transaction upon the floor of the Convention. His assistance in seeing that the subsequent form of this obligation was, as far as the Brotherhood was concerned, cancelled can in no way be construed as an effort to defraud the Bank. If anything it might be construed as inimical to the interests of the Brotherhood, but even if so, we are not concerned with such aspect of the transaction. Neither do Johnston's efforts to have this debt removed as a charge in the audit of the Brotherhood demonstrate that he recognized it as a **primary** debt of the Association. His actions are entirely consistent with a recognition of it as a debt of the Bank. That the Brotherhood had pledged its responsibility for the accommodation of the Bank would not put him in a more favorable light with the membership or constitute it less a charge which he desired not to appear.

Admitting as it does the absence of proof of direct knowledge on the part of Johnston of the character of the original Bank loan, the State supports its charge of guilt against Johnston wholly upon circumstantial evidence. It must do this because, of course, specific guilty intent can not be presumed. Nearly all of the several incidents given prominence by the State are susceptible of a sinister aspect. In our opinion they do not indicate even a possibility of guilt. As stated before, even if they did, this is not enough. The jury must have been convinced from the evidence that Johnston was guilty beyond a reasonable doubt.

Now in a civil action, if circumstantial evidence be relied upon for a conclusion, the rule requires merely that the balance tip in favor of the proponent. In a criminal case, the appropriate degree of proof becomes applicable and such circumstantial evidence must, if it be depended upon, sustain the added burden placed upon the proponent in a criminal case. We find a fair statement of the rule in **12 O. Jur., pages 475 to 479, §460:**

"The comparative value of testimony, direct or circumstantial, depends very much upon what it is in the particuar case. Circumstantial testimony may be of the most satisfactory character, and it is often the most convincing; it being more difficult to fabricate connected links in a chain of circumstances than a tale of positive facts. It has been said that it may with more certainty demonstrate a fact than the oath of an eye witness. In any case competent evidence of sufficient weight is all that is required. Direct evidence is not essential. The circumstances themselves must be clearly proven, and must all point in the same direction, and together must be irreconcilable with any other hypothesis. Circumstantial evidence is conclusive only where every link in the chain of circumstances is proved beyond the existence of a reasonable doubt. The inference which they compel should not be that the defendant might have done the deed, but that he actually did it. The particular facts and circumstances must be proved beyond a reasonable doubt, and when taken together must be so convincing as to be irreconcilable with the innocence of the accused, or, as said by some authorities, as to admit of no other hypothesis than the guilt of accused. Not every fact and circumstance in the case needs to be proven beyond a reasonable doubt, but every essential link in the chain of circumstances necessary to prove each or any of the charges, as claimed by the state, must be proven beyond a reasonable doubt. It is quite possible and probable that there may be a larger number of circumstances, no one of which will be established beyond a reasonable doubt, but yet the aggregate of which, where they all point one way to the guilt of the accused, may be such that there can be no reasonable doubt that the accused is guilty of the crime with which he is charged. In order to convict in a criminal case upon circumstantial evidence, each of the several circumstances relied upon to prove any essential element of the crime must be proven by direct testimony beyond a reasonable doubt; each, when all are taken together, must be consistent with all the others, and not inconsistent with any other established fact, and all, taken together, must point surely and unerringly to the guilt of the defendant, and must be inconsistent with any other rational supposition than that the defendant is guilty of the offense charged."

At the outset we noted the histories of Smith and Johnston. We are of the opinion that the joint trial of these two men had much to do with the verdict against Johnston. Whatever may be the rule as to civil liability of a director, the criminal responsibility of a director of a corporation can not be predicated alone upon his mere position as such. This is particularly ap-

plicable to the case of the State upon the false entry counts. The record is entirely void of one single instance of direct knowledge on the part of Johnston of the irregularities in the books of the several corporations involved and in which he was a director. Criminal intent to defraud or deceive cannot be predicated upon the premise that he should have known of entries constituting irregularities.

Our conclusion is, that the verdict of the jury as to the plaintiff in error Johnston was manifestly against the weight of the evidence.

An examination of the other assignments of error causes us to conclude that in this case no error intervened prejudicial to the plaintiff in error as to these.

The judgment of sentence of the Court of Common Pleas of Cuyahoga County is reversed, and the cause remanded to that court for a new trial.

MATTHEWS and HAMILTON, JJ, concur.